UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

98 - 2954

| | |
|---|---|
| LAURIE CORTESI, individually and on behalf of all others similarly situated, | Case No. |
| Plaintiff, | |
| -against- | **CLASS ACTION COMPLAINT** |
| LET'S TALK CELLULAR & WIRELESS, INC., NICOLAS MOLINA, and BRETT BEVERIDGE, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff, by her attorneys, for her class action complaint, alleges upon personal knowledge as to herself and her own acts, and upon information and belief as to all other matters, based upon, _inter alia_, the investigation made by and through her counsel, which investigation included, _inter alia_, a review of the public filings by Let's Talk Cellular & Wireless, Inc. ("Let's Talk" or the "Company") with the Securities and Exchange Commission ("SEC"), articles in the financial news media, press releases, and other publicly available information concerning the Company. Plaintiff believes that further substantial evidentiary support exists for the allegations set forth hereinafter following reasonable opportunity for discovery.

**NATURE OF ACTION**

1. Plaintiff brings this action as a class action on behalf of herself and all others similarly situated who purchased shares of Let's Talk common stock (the "Class") during the period November 25, 1997 (the date of the Company's Initial Public Offering) through July 2, 1998, inclusive, (the "Class Period"), to recover damages caused by defendants' violations of the federal securities laws.

2. Among other reasons, defendants caused these materially false and misleading statements to be made in order to (a) conceal the problems Let's Talk was encountering integrating acquired companies since its Initial Public Offering; (b) artificially inflate the price of Let's Talk stock so that Company insiders could enhance the value of their Let's Talk stock and option holdings and sell, collectively, more than 190,000 shares of their Let's Talk stock at artificially inflated prices for gross proceeds in excess of $3 million; (c) use Let's Talk stock as currency for acquisitions; and (d) protect the individual defendants' executive positions and substantial compensation and prestige attendant therewith.

## JURISDICTION AND VENUE

3. This action arises under Section 10(b) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), 15 U.S.C. §78j(b), Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, Section 20 of the Exchange Act, 15 U.S.C. §78t.

4. Jurisdiction is conferred upon this Court by Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331. This Court has personal jurisdiction over defendants pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa.

5. Venue is proper in this District because Let's Talk has its principal place of business in this District, many of the individual defendants reside and/or transact business in this District, and witnesses are found in this District. Moreover, many of the acts and transactions constituting the violations of law complained of herein occurred within this District, including the preparation and dissemination of materially false and misleading financial statements, corporate documents, and press releases.

## PARTIES

6. Plaintiff Laurie Cortesi purchased shares of Let's Talk common stock during the Class Period (as set forth in the

3

accompanying certification), and was damaged thereby.

7. Let's Talk is a Florida corporation with its principal executive offices located at 800 Brickell Avenue, Miami, Florida, 33131. Let's Talk is the largest independent specialty retailer of cellular and wireless products, services and accessories in the United States. The Company's stores are located predominately in regional shopping malls, offer one-stop shopping for consumers to purchase cellular, personal communication system, paging, internet, satellite and other wireless products and services and related accessories. On November 25, 1997, pursuant to a prospectus and registration statement filed with the SEC ("Prospectus"), Let's Talk commenced the public offering of 2,337,245 shares of common stock at a price of $12.00 per share. Let's Talk stock trades on the NASDAQ stock market, an efficient and automated market.

8. Defendant Nicolas Molina ("Molina") was, until his resignation on October 9, 1998, Chief Executive Officer and a director. Molina co-founded the Company in 1989. According to the Prospectus, defendant Molina was primarily responsible for the Company's finance, administration, human resources, MIS, expansion of the Company's retail operations, as well as other general corporate matters.

(a) Defendant Molina knew of, or recklessly disregarded the adverse, non-public information about Let's Talk

4

business and operations, as well as its finances, markets, and present and future business prospects because his executive and directorial positions provided him with access to internal corporate documents and information (including, the Company's operating plans, budget and forecasts, and reports of actual operations compared thereto), and allowed him to have conversations and meeting with other corporate officers and employees. Molina attended management and Board of Directors' meeting and committees thereof, and received internal reports and other information in connection therewith.

(b) Defendant Molina's participation included the preparation and dissemination of false and/or misleading press releases, SEC filings, dissemination of false statements during presentations at securities conferences, analyst conference calls, and during individual conversations with securities analysts.

(c) In 1997, defendant Molina received from the Company a salary of $198,000 and "other compensation" of $33,960. At December 1, 1997, Molina beneficially owed 929,000 shares of Let's Talk outstanding stock.

(d) Shortly before revealing that, among other things, the Company would report a shortfall in earnings and revenues for the fourth quarter of 1998, due to a weakness in retail sales and higher than expected merger integration costs,

5

defendant Molina sold 87,000 shares of Let's Talk stock yielding proceeds of approximately $1,435,500.

(e) Defendant Molina signed all quarterly reports filed with the SEC on Forms 10-Q during fiscal year 1998.

9. Defendant Brett Beveridge ("Beveridge") is, and has been, since inception of the Company, Chairman of the Board of Directors and President. Defendant Beveridge co-founded the Company with defendant Molina in 1989. According to the Prospectus, defendant Beveridge has been primarily responsible for the Company's retail operations and other general matters. At December 1, 1997, defendant Beveridge beneficially owned 928,000 shares of Let's Talk outstanding stock.

10. Shortly before revealing that, among other things, the Company would report a shortfall in revenues and earning for the fourth quarter of 1998, due to weak in retail sales and higher than expected merger integration costs, defendant Beveridge sold 87,000 shares of Let's Talk common stock yielding proceeds of approximately $1,435,500.

11. The individual defendants, as officers and/or directors of Let's Talk had a duty, because of the positions they held, to disseminate complete, accurate, and truthful information regarding Let's Talk, financial and business operations. The individual defendants also had a duty to correct promptly any public statements issued by Let's Talk that had become false and

6

misleading.  Because of their positions, their ability to exercise power and influence with respect to Let's Talk course of conduct, and their access to material inside information about Let's Talk, the individual defendants were, at the time of the wrongs alleged herein, controlling persons of Let's Talk within the meaning of Section 20(a) of the Exchange Act.

## **CLASS ACTION ALLEGATIONS**

12.  Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(30) on behalf of herself and a class consisting of all persons who purchased Let's Talk common stock during the period from November 25, 1997 through July 2, 1998, inclusive, and who suffered damages thereby.  Excluded from the Class are defendants, members of the immediate families of the individual defendants, any entity in which any defendant has a controlling interest in or is a parent or subsidiary of or is controlled by the Company, and the officers, directors, affiliates, legal representatives, heirs, predecessors, successors and assigns of any of the defendants.

13.  The members of the Class are so numerous that joinder of all members is impracticable.  Although the exact number of class members is unknown at this time and can only be ascertained from the books and records maintained by Let's Talk and/or its agents, plaintiff believes there are hundreds, if not

thousands, of members of the Class, who purchased their shares during the Class Period. At December 1, 1997, there were more than 6 million shares of Let's Talk common stock outstanding.

14. The members of the Class are located throughout the United States. The names and addresses of the record owners of the shares of Let's Talk common stock purchased during the Class Period are available from Let's Talk and/or its transfer agents(s). Notice can be provided members of the Class using the form of notice similar to that customarily used in securities class actions.

15. There are questions of law and fact common to the Class that predominate over questions affecting any individual member of the Class. Among the questions of law and fact common to the Class are whether:

(a) defendants violated the federal securities laws by their acts and omissions as alleged herein;

(b) Let's Talk issued materially false and misleading statements during the Class Period;

(c) defendants acted knowingly or recklessly in issuing materially false and misleading statements;

(d) the market prices of Let's Talk securities during the Class Period were artificially inflated because of defendant's conduct complained of herein; and

(e) members of the Class have sustained damages and, if so, what is the proper measure of damages.

Plaintiff's claims are typical of the claims of the members of the Class, as plaintiff and members of the Class sustained damages arising out of defendants' wrongful conduct in violation of Federal law as complained of herein.

16. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in a class action securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

17. A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by individual class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for class members individually to redress the wrongs done to them. Plaintiff envisions no difficulty in the management of this action as a class action.

## **FRAUD-ON-THE-MARKET ALLEGATIONS**

18. With regard to her allegations arising under Section 10(b) and Rule 10b-5, plaintiff intends to rely on the

9

fraud-on-the-market doctrine, as there is an efficient market for Let's Talk common stock.  In that connection, brokers nationwide have immediate access to press releases and trading information about Let's Talk through computer and news wire systems.  These systems display, within minutes of the release or transaction taking place, pertinent information and the most recent trades and prices.  Among the securities firms that followed the Company during the Class Period was Merrill Lynch & Co., Inc.

19.  Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)  defendants made misrepresentations or failed to disclose facts during the Class Period;

(b)  the omissions and misrepresentations of fact were material;

(c)  Let's Talk met the requirements for listing, and its stock was listed on the NASDAQ Stock Market, an efficient and automated market;

(d)  as a regulated issuer, Let's Talk filed periodic public reports with the SEC;

(e)  Let's Talk trading volume, during the Class Period, was substantial, thereby reflecting numerous trades each day; and

10

(f) plaintiff and the members of the Class purchased their common stock during the Class Period without knowledge of the omitted or misrepresented facts.

20. Based upon the foregoing, plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market for their Section 10(b) claims.

## NO SAFE HARBOR

21. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in the complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statement alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, there was no statement made with respect to any of those representations forming the basis of this complaint that actual results "could differ materially from those projected," and there were not meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor is intended to apply to any forward-looking statements pleaded herein, defendants are liable

11

for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker had actual knowledge that the particular forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company, who knew that those statements were false when made.

## SUBSTANTIVE ALLEGATIONS

22. Throughout the Class Period, defendants touted the Company's enormous growth through its acquisitions of other specialty retailers and its own new store openings. In addition, as emphasized in the Prospectus, defendants recognized that in order to maintain and increase sales the Company had to hire and train and/or retain well qualified and knowledgeable sales personnel. Defendants knew that in order to continue Let's Talk unprecented growth the Company had to continue its acquisition spree and successfully integrate its acquisitions into the Company's existing infrastructure and financial controls. In addition, defendants knew that in order to maintain the Company's sales Let's Talk had to have knowledgeable, experienced and motivated sales personnel. However, throughout the Class Period, defendants made a series of materially misleading statements and/or failed to disclose material adverse information regarding,

12

among other things, (1) the Company's lack of internal controls necessary to identify and manage the operating costs caused by the Company's numerous acquisitions over a short period of time; and (2) that as a result of changes its compensation plan for its sales personnel the Company was experiencing a large turnover in sales personnel causing a slowdown in retail sales.

23. Let's Talk was founded in 1989 by defendants Molina and Beveridge. During the first three years of operations the Company opened 3 stores. By early 1995, Let's Talk had 14 stores. In 1996, the Company opened 25 stores. From June 1996 through September 30, 1997, the Company opened 54 stores and acquired 24 stores, and as of September 30, 1997, operated a total of 102 stores. On November 25, 1997, Let's Talk completed its initial public offering ("IPO") of 2,337,245 shares of common stock listed and traded on the NASDAQ National Market. The stock was offered at $12 per share.

24. In the Prospectus, the Company stated that it intended to continue to increase the number of stores through selective acquisition of other specialty retailers of cellular and wireless products in addition to those stores opened by the Company. Among other things, the Prospectus portrayed the Company as a rapidly expanding specialty retailer of cellular and wireless products with a well developed and achievable strategy for rapidly attaining sustained and growing profitability. Thus, for example the Prospectus states:

13

The Company believes that the independent retail market for cellular and wireless products is highly fragmented and consists of numerous independent specialty retailers in each major metropolitan area. Through selective acquisitions, the company seeks to obtain immediate access to desirable markets and locations, qualified sales personnel and, in some cases, an existing subscriber base. The Company believes it can successfully apply its operating strategy and leverage its existing infrastructure and financial controls with such acquisitions. Recent acquisitions completed by the Company include (i) Peachtree Mobility, one of AirTouch Cellular's largest agents in Atlanta, acquired in August 1996 and (ii) Telephone Warehouse, one of the largest AT&T agents in the southwestern U.S., acquired in June 1997. In addition, the Company has entered into definitive agreements for the acquisition of (i) Cellular USA, Inc. ("Cellular USA"), one of AT&T's largest agents in Las Vegas, which operates six retail stores (the "Cellular USA Acquisition"), and (ii) Cellular Unlimited Corp. ("Cellular Unlimited"), one of Cellular One's largest agents in upstate New York, which operates 15 retail stores (the "Cellular Unlimited Acquisition").

25. The Prospectus also touted the Company's Sophisticated Financial Controls. On page 36, the Prospectus states:

Sophisticated Financial Controls. Each Let's Talk Cellular & Wireless store is equipped with a modern point-of-sale computer terminal. The point-of-sale terminals are linked to a central computer at the Miami headquarters, allowing the Company's finance staff to continuously monitor sales and inventor levels. The system is capable of generating financial statements at the store level, providing management with key operating and financial data in a timely manner, thereby allowing the Company to respond quickly to changes in consumer

14

preferences and emerging industry trends. The Company anticipates spending approximately $650,000 during fiscal 1998 in connection with the upgrading of its entire corporate MIS system, which will allow the Company to efficiently monitor up to 300 retail locations. This new system is expected to be fully tested and on-line by April 1998.

26. In addition, the Prospectus repeatedly stressed its superior sales people and customer service. For example on page 41, the Prospectus states:

Customer Service. With the technological advancements and introductions of new products and service options in the wireless industry, customers are more likely to require the advice of increasingly qualified salespeople to assist in product and service selections. Management believes that its emphasis on training and customer service distinguishes the Company within the industry and is an important part of its business strategy. The Company seeks to maximize customer satisfaction as well as repeat and referral business by providing high quality, extensive employee training programs on an ongoing basis designed to ensure that functional elements of its products and services as they are introduced. Each sales professional receives two weeks of classroom training and two additional weeks of in-store training prior to his permanent assignment. new products and services are introduced to the Company's ales staff by supplier and carrier representatives prior to the public. The Company emphasizes a consultative selling process in which sales personnel inquire about the needs and desires of each customer, in an attempt to recommend the most appropriate products and services. The Company's sales representatives' compensation is comprised of a base salary and a sales commission on product sales. In addition to in-store promotions, the Company's sales force generate repeat and referral business

by contacting existing and prospective customers via telephone. The Company offers everyday low prices that are competitive with other retailers and support this policy with a lowest-price guarantee, a 7-day return policy and a 30-day satisfaction guarantee to provide customer assurance and satisfactions. In addition, customers are eligible to receive 100% credit for their product purchases if they upgrade within 12 months of the original purchase.

27. The Prospectus also indicated that acquisitions and new store expansions had resulted in a marked increase in revenues in fiscal 1997 over fiscal 1996. In fiscal 1997, total net revenues increased $16.5 million (or 121.1%) to $30.1 million, from $13.6 million in fiscal 1996. This growth was attributed to increases in retail sales, activation commissions and residual income, and to the acquisition of Telephone Warehouse on June 30, 1997 and the resulting inclusion of Telephone Warehouse's operations in the Company's consolidated revenues for the month of July 1997. Sales relating to 45 new stores opened for the entire year, 4 stores open for a portion of fiscal 1997, and 24 stores acquired during fiscal 1997 accounted for $12.6 million, or 76.3%, of the Company's increase in total net revenues. Let's Talk Cellular reported an increase in gross profit of $8.1 million, or 115.1% to $15.2 million in fiscal 1997 from $7.1 million in fiscal 1996. The Company suffered a net loss applicable to common shareholders of $366,000 in fiscal 1997 as compared to $66,000 of income in fiscal 1996, due to distribution of $320,000 to preferred shareholders to induce conversion of outstanding Series

16

A Preferred Stock.

28.   The Prospectus was materially false and misleading and misrepresented and/or failed to disclose that the Company could not reasonably rely upon its internal management information systems and accounting systems for reliable accounting data and information, which would preclude its ability to expand either through internal growth or through acquisitions, and would ultimately force the Company to acknowledge that its internal controls systems were materially inadequate.

29.   In addition, the Prospectus was materially false and misleading and misrepresented and/or failed to disclose that any material change in the Company's sales personnel and/or compensation plan for the Company's sales personnel would materially adversely effect the Company's sales.   In fact, the Prospectus detailed the need for experienced, well trained sales personnel to generate, maintain and increase repeat and referral business.

30. Although   the   Prospectus   also   states   that "unforeseen capital and operating expenses, or other difficulties or delays frequently encountered in connection with the expansion and   integration   of   acquired   operations   could   have   an   adverse effect   on   the   Company. . ." this   generalized,   boilerplated disclaimer was materially insufficient to apprise investors that the Company's infrastructure and controls were insufficient to

support the Company's "growth strategy." Furthermore, the Prospectus was silent regarding the effect on sales caused by turnover and change to the Company's sales force.

31.  On December 2, 1997, Let's Talk disclosed that it had completed its acquisition of Cellular Unlimited Corp.

32.  On December 18, 1997, Let's Talk announced over the PR Newswire that it had completed its acquisition of Cellular U.S.A. Inc.  Commenting on the acquisition, defendant Molina stated:

> Since opening our first store in 1989, the Company has expanded through internal expansion and acquisitions.  Today, Let's Talk Cellular operates 138 stores predominantly in regional shopping malls, seeking to offer one-stop shopping for customers to purchase cellular, PCS, paging, internet, satellite and other wireless products and services and related accessories.  The acquisition of Cellular USA is part of Let's Talk Cellular's ongoing growth strategy of expansion into desirable markets and locations.

33.  On December 27, 1997, Merrill Lynch initiated coverage of Let's Talk with a buy rating.

34.  On January 8, 1998, Let's Talk announced that its same store sales for the 1997 Holiday season were ahead of plan. Same store sales increased approximately 19% and 11% in November 1997 and December 1997, respectively.  Commenting on this January 8, 1998 announcement, defendant Beveridge was quoted as saying:

18

> At a time when many retailers are reporting sluggish holiday sales, we are very pleased with our performance. These results came in addition to the very strong sales results already achieved during the same period last year, when comparable store sales increased approximately 20% and approximately 29% in November 1996 and December 1996, respectively.

In addition, defendant Molina was quoted as saying:

> This strong performance during these critical months further shows the strength of our concept and our ability to execute. Additionally, the Company's expansion strategy is also ahead of plan as of December 31, 1997. The Company opened 8 locations and acquired an additional 20 locations in two acquisitions during November and December 1997, bringing the year-end total to 139 stores versus 49 at December 31, 1996.

35.  On February 23, 1998, Let's Talk announced over the PR Newswire that it had signed a definitive agreement to acquire Cellular Warehouse of Atlanta for 900,000 newly issued shares of Let's Talk common stock and $20 million in cash.  Cellular Warehouse had 54 stores in Florida, Georgia, North Carolina, South Carolina, Alabama and Tennessee.

36. Commenting on the acquisition of Cellular Warehouse, defendant Molina was quoted as saying:

> We are very excited about the opportunities this acquisition presents for several reasons. Cellular Warehouse is a tremendous complement to the Let's Talk Cellular & Wireless organization, strengthening our presence in two key existing markets, Florida and Georgia, and securing an immediate

presence in several new desirable markets including Alabama, Tennessee and the Carolina's. Additionally, it meets our acquisition criteria, including new and existing market dominance, excellent store locations, qualified management and sales personnel and extensive subscriber base.

37. Defendant Beveridge added:

The acquisition strengthens our core business by providing us with increased purchasing power, increased leverage of our infrastructure and managerial expertise in operating strip center locations. Furthermore, it reflects the successful implementation of the acquisition piece of our growth strategy.

38. Defendants' statements were materially false and misleading because they created the false impression that either the integration of Cellular Warehouse was not necessary or would be largely completed without material problems or cost.

39. In addition, as stated in the Prospectus the Company's sales were dependent on experienced trained personnel. The Company had established an intensive employee training program that each sales personnel had to complete prior to permanent employment. While touting that the acquisition of Cellular Warehouse would give Let's Talk an immediate presence in existing markets, defendants knew that the sales personnel of Cellular Warehouse would have to participate in Let's Talk training program. Defendant knew or were reckless in not knowing that the Company's inability to hire or retain, experienced, qualified sales personnel would have a material adverse impact on the

20

Company's financial results.

40. On March 11, 1998, the Company announced over the PR Newswire Let's Talk's financial results for the second quarter and six months ended January 31, 1998. Let's Talk reported revenues for the second quarter of $32.7 million, as compared to $20.9 million for the second quarter the previous year. Let's Talk reported gross profit of $13.3 million as compared to $8.5 million in the prior year period.

41. Commenting on the second quarter results, defendant Beveridge stated:

> We are extremely pleased with our results for the second quarter of 1998 ... These results reflect the strength of the company's business fundamentals and our ability to effectively execute our marketing strategies. Furthermore, we are especially pleased with our same store sales performance during the 1997 holiday season. At a time when many retailers were reporting sluggish holiday sales, we reported strong increases in same store sales for November and December 1997. These results came in addition to the very strong sales already achieved during the same period last year, when same store sales increased 20% and 29% in November 1996 and December 1996, respectively.

Defendant Molina, also commenting on the second quarter results added:

> During the first six months of fiscal 1998 we made significant progress in our new store expansion strategy which has fortified our retail market position and enhanced our growth potential. Additionally, acquisitions

21

> have played a key role in advancing the company's business model by enabling Let's Talk Cellular & Wireless to obtain immediate access to desirable markets and qualified sales personnel and by growing our existing subscriber base. During the 1998 second quarter we completed two synergistic acquisitions. Cellular Unlimited Corp., one of Cellular One's largest agents, providing the company with 14 retail stores in upstate New York. The acquisition of Cellular USA Inc., one of AT&T's largest agents in Las Vegas, provided Let's Talk Cellular & Wireless six retail stores in this important cellular market.

42. Defendant Molina's statement that the Company's acquisitions enabled it to obtain immediate access to desirable markets and qualified sales personnel tacitly suggested that the integration of these specialty retailer was either not necessary or was largely completed without material problems or cost. In fact, as was eventually admitted by the defendants the Company did not have a control system in place to track operating costs caused by the absorption of its acquisitions.

43. On March 13, 1998, along with announcing the appointment of a new chief financial officer, Let's Talk announced the acquisition of all of the assets of Laser Electronics, Inc., a specialty retailer of paging and accessories. The terms of the acquisition were not disclosed.

44. On March 17, 1998, Let's Talk filed its Form 10-Q for its first quarter ended January 31, 1998. Let's Talk's first quarter Form 10-Q reported results as announced on March 13, 1998.

22

The Form 10-Q purported to describe the material facts regarding the Company's recent acquisitions. The first quarter Form 10-Q stated, in relevant part, that:

4-ACQUISITIONS

On December 1, 1997, the Company acquired substantially all of the assets of Cellular Unlimited Corp. for a cash purchase price of $2,055,000 and up to $255,000 in certain contingent payments in each of the six-month periods ending July 31, 1998, January 31, 1999 and July 31, 1999.

Additionally, on December 17, 1997, the Company acquired all of the outstanding capital stock of Cellular USA, Inc. for a cash purchase price of $1,625,000 and up to an aggregate of $175,000 in certain contingent payments in 1998 and 1999.

5-SUBSEQUENT EVENTS

Effective February 1, 1998, the Company entered into a binding agreement for the acquisition of all of the outstanding capital stock of Cellular Warehouse of Atlanta, Georgia, in exchange for 900,000 shares of the Company's common stock and $20 million in cash. The acquisition, which is subject to customary regulatory approval, is expected to be completed in late March. Cellular Warehouse, established in 1991, owns and operates 57 retail stores in Florida, Georgia, North Carolina, South Carolina, Alabama and Tennessee; the retail stores are located in strip and power strip shopping centers. For the twelve months ended December 31, 1997 Cellular Warehouse had revenues of approximately $37.8 million.

On February 22, 1998, the Company acquired substantially all of the assets of Lazer Electronics Inc., and Best Electronics and Paging, Inc. for a total cash purchase price of $190,000. Lazer owns and operates 8 retail stores in Texas, Georgia and Florida, which are primarily located in regional

23

malls.

45.   On April 2, 1998, pursuant to a Form 8-K filed with the SEC, Let's Talk completed the acquisition of all of the outstanding stock of Sosebee Enterprise Inc. for 550,000 shares of Let's Talk common stock and $19.9 million in cash.

46.   On April 3, 1998, Let's Talk announced over the PR Newswire that it had completed the acquisition of Cellular Warehouse.   In the transaction, Let's Talk issued 550,000 shares of common stock and paid approximately $17 million in cash for all of the outstanding stock of Cellular Warehouse.   On April 2, 1998, the stock price of Let's Talk was approximately $19.

47.   On June 10, 1998, Let's Talk announced over the PR Newswire its results for the third quarter ended April 30, 1998:

> For the third quarter ended April 30, 1998, net revenues were $32.0 million versus 1997 third quarter comparable net revenues of $23.3 million, which represents a 37.4% increase.   On an "as reported" basis, the Company's third quarter total net revenues increased 437.9% over net revenues of $6 million for the third quarter ended April 30, 1997. The Company reported gross profit of $15.6 million as compared to $10.7 million in the prior year period.   The 1997 comparable financial data reflects the effects of the Telephone Warehouse and Cellular Warehouse acquisitions (which includes nine and two months of operations, respectively) and the sale of common stock completed in the Company's recent public offering.   The 1998 comparable financial data excludes a one-time extraordinary charge taken in the third quarter of 1998 in connection with debt retirement.   Same store sales increased by

24

10.3% during the 1998 third quarter. The Company also reported that it opened 22 new locations and acquired 64 locations during the quarter for a total of 230 new stores operating as of April 30, 1998.

48. Commenting on the third quarter results, defendant Beveridge was quoted as saying:

Not only did we complete another record quarter of sales and earnings growth, but we successfully integrated several acquisitions, including Cellular USA, Cellular Unlimited Corp. and Cellular Warehouse, into the Let's Talk Cellular & Wireless operating model. Additionally, we strengthened our senior management team with the addition of Daniel M. Cammarata as Chief Financial Officer in March and Richard Sosebee as President of Cellular Warehouse. While these actions contributed to slightly higher operating expenses, we firmly believe these initiatives are prudent and strategically position the Company for future growth.

Defendant Molina further added:

We have taken an aggressive, yet deliberate, approach aimed at building upon our position as the leading independent specialty retailer of cellular and wireless products in the United States. Continuing with our new store expansion, we opened 22 stores during the quarter in both new and existing markets bringing our total to 230 stores. We also completed two strategic acquisitions, Cellular Warehouse and Laser Electronics, Inc., that played a key role in obtaining access to desirable markets and growing our subscriber base. These initiatives, together with the maturation of the Let's Talk Cellular & Wireless store base and an effective mix of merchandising and advertising, are all having a positive impact on the growth of the business. Accordingly, same store sales during the 1998 third quarter increased 10.3%.

49. Contrary to defendants' assertions, the integration process was floundering and consequently, Let's Talk was experiencing increased operating costs. The Company was not equipped to identify and manage these escalating costs. The Company did not have the control systems in place to track Let's Talk's operating costs caused by the absorption of its acquisitions over a short period of time under defendants' overly aggressive acquisition program. Defendants' statements concerning the Company's strategy for expansion and its future prospects, starting with those included in the Prospectus were materially misleading by the failure to adequately and properly disclose the numerous problems confronting the Company's expansion plan and which would severely impact the Company's financial results.

50. On June 12, 1998, Let's Talk filed its financial report on Form 10-Q for the third quarter ended April 30, 1998. The Form 10-Q was signed by defendant Molina. Let's Talk repeated the financial results reported in the June 10, 1998 press release.

51. On June 12, 1998, Merrill Lynch reiterated its "buy" recommendation noting that the increase in operating expenses was mainly due to the Cellular Unlimited and Cellular USA acquisitions "which have now been completely integrated into Let's Talk business line."

52. On June 16, 1998, defendants Molina and Beveridge each filed forms with the SEC to sell 87,000 shares of Let's Talk

26

common stock. Defendants Molina and Beveridge sold their stock a price ranging between $14 and $17 per share yielding over $1.4 million each.   These sales were unusual and suspicious in timing, as the sales occurred after the Company's announcement on June 10 of record revenues but two weeks before the Company announced its poor results for the fourth quarter.

53.   On July 2, 1998, Let's Talk made the shocking announcement that revenues and earnings for the fourth quarter ended July 31, 1998 would be lower than expected due to, among other things, higher than anticipated costs due to delays in the integration of previous acquisitions.   The Company also announced for the first time a "softness in wholesale sales" and a weakness in retail sales resulting from a change in incentive pay hurt sell through.    Defendant Molina admitted that revenues had been deteriorating since May.   He stated:

> Although our fourth quarter revenues will be above last year's fourth quarter results, it will still be below expectations.   We have experienced the effects of revenue softness during May and June which, combined with higher than expected costs related to the integration of previous acquisitions into the Let's Talk Cellular & Wireless business model, will translate into revenue and net income shortfalls.   We have already taken steps to reverse incentive pay changes which we expect will put revenues back on track. We have also put controls in place to bring G&A costs back in line with budgeted levels.

On this news, the price of Let's Talk stock plunged from $12-7/8 per share on July 1, 1998 to close at $5-11/16 on July 2, 1998.

27

## **Defendants' Responsibility For Adequate Internal Controls**

54.   Statement on Auditing Standards ("SAS") No. 55, AU § 319.03, n.1 explains that management must establish and maintain effective internal controls.   These responsibilities are broad. Thus, management must implement a plan that ensures that reliability of financial reporting, (b) effectiveness of operations, and (c) compliance with applicable laws and regulations.   Management must continually ensure that such plan reduces risks to a reasonable level and modify it as conditions at the Company change.

55.   As amended in December of 1995, SAS 55, ¶ 6 states:

> Internal control is a process – effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the achievement of objectives in the following categories:   (a) reliability of financial reporting, (b) effectiveness of operations, and (c) compliance with applicable laws and regulations.

Paragraph 7 of SAS 55 continues:

> Internal control consists of the following five interrelated components:   a.   Control environment sets the tone of an organization, influencing the control consciousness of its people.   It is the foundation for all other components of internal control, providing discipline and structure.   b.   Risk assessment is the entity's identification and analysis of relevant risks to achievement of its objectives, forming a basis for determining how risks should be managed. . . e. Monitoring is a process that assesses the quality of internal control over time.

56.   Significantly, SAS, ¶ 29 requires that defendants must assess, respond, and timely adjust to the risks attendant with Let's Talk's acquisition spree:

> Risks relevant to financial reporting include external and internal events and circumstances that may occur and adversely affect an entity's ability to record, process, summarize, and report financial data consistent with the assertions of management in the financial statements.
>
> n.5 Risks can arise or change due to circumstances such as – – [a] Changes in operating environment, [b] New Personnel, [c] New or revamped information systems, [d] Rapid growth, . . . [f] New lines, products, or activities, [and g] Corporate restructurings. . .

57.   Paragraph 37 of SAS 55 states that "An important function of management responsibility is to establish and maintain internal control . . .   It involves assessing the design and operation of controls on a timely basis and taking necessary corrective action."

58.   Finally, as ¶ 2 to SAS No. 1 makes clear, "The financial statements are management's responsibility."

59.   Against this background, defendants failed to comply with these basis internal accounting control principles. Defendants had neither the internal control systems to successfully integrate the myriad acquisitions made by the Company.

29

60.   In their effort to further expand its position in the cellular and wireless products retail market, defendants acquired at least 4 specialty retailers, in the eighteen months following the IPO.   While defendants touted the purported synergies and economies resulting from these acquisitions, they failed to reveal that the Company was in fact struggling badly to successfully absorb and integrate the new companies.

**SCIENTER ALLEGATIONS**

61.   As alleged herein, defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly participated in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

62.   As set forth herein, the individual defendants, by virtue of their receipt of information reflecting the true facts regarding the Company and/or their control over the Company, which made them privy to confidential proprietary information, participated in the fraudulent scheme alleged herein.   With respect to non-forward-looking statements and/or omissions, defendants knew and/or recklessly disregarded the falsity and

30

misleading nature of the information that they caused to be disseminated to the investing public.

63. The individual defendants engaged in such a scheme and course of conduct to inflate the price of Let's Talk common stock in order to: (i) acquire third parties using the Company's stock as the currency for the transaction; and (ii) enable the individual defendants to profit from the sale of the Company's common stock at artificially inflated prices.

64. The individual defendants had the opportunity to commit and participate in the wrongful conduct complained of herein. Each is, or was, a senior executive officer of Let's Talk and, accordingly, controlled the information disseminated to the investing public in Let's Talk's press releases, SEC filings, and communications with analysts. Thus, each could falsify, and did falsify, the information that reached the public about Let's Talk's business, products and financial results.

## COUNT I

### Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder (Against All Defendants)

65. Plaintiff repeats and realleges each and every allegation contained above, as if set forth herein.

66. Defendants, individually and in concert with, directly and indirectly, by the use of means or instrumentalities

31

of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon plaintiff and the other members of the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, and artifices to defraud in connection with the purchase and sale of securities in that each of the defendants: (a) knew or had access to the material adverse non-public information about Let's Talk's financial results and then-existing business conditions, which were not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representations of and about Let's Talk.

67. During the Class Period, defendants, with knowledge of and or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

68. At all times relevant herein, the material misrepresentations and omissions particularized herein directly or proximately caused the damages sustained by plaintiff and the other members of the Class.

69. As directors and senior corporate officers of Let's Talk, the individual defendants had knowledge of the details of the Company's business and operations. Plaintiff and members of the Class, who purchased shares of Let's Talk common stock on the open market, did not have knowledge of the details of Let's Talk's internal corporate affairs.

70. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of the Company's common stock was artificially inflated during the Class Period. In ignorance of the materially false and misleading nature of the reports and statements described above, plaintiff and the other members of the Class relied to their detriment on the statements described above and/or on the integrity of the market price of the Company's common stock as reflecting the completeness and accuracy of the information disseminated by the Company in connection with their purchases of the Company's securities.

71. At the time of such misstatements and omissions, plaintiff and the other members of the Class were ignorant of their falsity, and believed them to be true. Plaintiff and the other members of the Class could not, in the existence of reasonable diligence, have known the actual facts. Had plaintiff and the other members of the Class known the truth, they would not have taken such action.

72. As a result of these materially false and misleading statements and failures to disclose the truth about Let's Talk, its financial condition, performance and business, Let's Talk common stock traded at artificially inflated prices during the Class Period, until the time the adverse information referred to above was finally provided to and digested by the securities markets. Plaintiff and other members of the Class purchased or otherwise acquired Let's Talk stock relying upon the integrity of the market price of Let's Talk stock and market information relating to Let's Talk, or in the alternative, upon defendants' false and misleading statements, and in ignorance of the adverse, undisclosed information known to defendants, and have been damaged thereby. Those who sold their shares during the Class Period were not able to fully recoup their out-of-pocket losses and damages.

73. Plaintiff and other members of the Class have suffered substantial damages as a result of their purchase(s) of Let's Talk common stock.

74. This action is brought within three years after the securities at issue were purchased and within one year after the discovery of the untrue statements and omissions or after such discovery should have been made by the exercise of reasonable diligence.

75. By virtue of the foregoing, defendants have

34

violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.


## COUNT II

### For Liability Pursuant To Section 20(a) Of The Exchange Act (Against The Individual Defendants)

76. Plaintiff repeats and realleges each and every allegation stated above, as if fully set forth herein.

77. Plaintiff asserts this Count for liability pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of all members of the Class and against the individual defendants.

78. Through their positions of control and authority at the Company, the individual defendants were able to and did control, directly and indirectly, the content of the public statements disseminated by the Company. With knowledge of the falsity of the statements contained therein and in reckless disregard of the true status of the business of the Company, the individual defendants caused the false and misleading statements and omissions of material facts as alleged herein.

79. By reason of their positions and stock ownership, the individual defendants were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and had the power and influence to direct the management and activities of the Company and its employees, and to cause the Company to engage in

35

the unlawful conduct complained of herein. Because of their executive and directorial positions within Let's Talk, the individual defendants had access to adverse, non-public information about the Company and acted to conceal the same, or knowingly or recklessly authorized and approved the concealment of the same.

80. By virtue of the foregoing, each individual defendant is liable for the violation of Section 10(b) pursuant to Section 20(a) of the Exchange Act.

81. Plaintiff and the other members of the Class have been damaged by the violations of the individual defendants as described in this Count and seek recovery for the damages caused thereby.

**WHEREFORE**, plaintiff, on behalf of herself and the other members of the Class, prays for judgment as follows:

A. Declaring this action to be a proper class action maintainable pursuant to Fed. R. Civ. P. 23 and 23(b)(3) and declaring plaintiff to be a proper class representative;

B. Awarding plaintiff and the other members of the Class the damages suffered as a result of the wrongs complained of herein together with appropriate interest;

C. Awarding plaintiff and the other members of the

36

Class their costs and expenses of this litigation, including reasonable attorneys' fees and experts' fees and out-of-pocket costs and disbursements; and

D. Awarding plaintiff and the other members of the Class such other and further relief as may be just and proper under the circumstances.

Plaintiff demands a trial by jury.

Dated:    December 3, 1998

GOODKIND LABATON RUDOFF
   & SUCHAROW

By:_____
   Emily C. Komlossy
   Florida Bar No.  007714
   Peter H. Rachman
   Florida Bar No.  977756
   2455 East Sunrise Blvd
   Suite 813
   Fort Lauderdale, FL 33304
   (954) 630-1000
   (954) 565-1312 fax

ABBEY, GARDY & SQUITIERI, LLP
   Lee Squitieri
   Nancy Kaboolian
   212 East 39th Street
   New York, New York  10016
   (212) 889-3700
   (212) 684-5191 fax

37

## SWORN CERTIFICATION

I, Laurie Cortesi, certify that:

1.    I have reviewed the complaint and authorized its filing;

2.    I did not purchase the security that is the subject of this action (Let's Talk Cellular & Wireless, Inc.) at the direction of plaintiff's counsel, or in order to participate in any private action arising under this title.

3.    I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.    My transactions in the security that is the subject of this litigation during the class period set forth in the complaint are as follows:

Purchases:

| Date | Shares Bought | Price Per Share |
|------|---------------|-----------------|
| 6/2/98 | 500 | $17¼ |

Sales (if any):

| Date | Shares Sold | Price Per Share |
|------|-------------|-----------------|
| 11/9/8 | 500 | 4.14 |

5. I have not served as or sought to serve as a representative party on behalf of a class under this title during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court including the award to a representative of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

The foregoing are, to the best of my knowledge and belief, true and correct statements.

Signed: _Fred-Slater POA Laurie Coates._

(g:\wpS1\minerva\letecalk\blank.cer)

JS 44
(Rev. 12/96)

# CIVIL COVER SHEET

CIV - GOLD

98-2954

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

LAURIE CORTESI, individually and on behalf of all others similarly situated.

## DEFENDANTS

LET'S TALK CELLULAR & WIRELESS, INC., NICOLAS MOLINA, and BRETT BEVERIDGE

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _Broward Cty, FL_
(EXCEPT IN U.S. PLAINTIFF CASES)

~ SOUTH-9954 GOLD/TEB

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _DADE_
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
GOODKIND LABATON RUDOFF & SUCHAROW LLP
International Building, Suite 813
2455 East Sunrise Boulevard
Ft. Lauderdale, Florida 33304        (305) 579-1260

ATTORNEYS (IF KNOWN)        MAGISTRATE
BANDSTRA

**(d)** CIRCLE COUNTY WHERE ACTION AROSE   DADE,   MONROE,   BROWARD,   PALM BEACH,   MARTIN,   ST. LUCIE,   INDIAN RIVER,   OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION   (PLACE AN 'X' IN ONE BOX ONLY)

☐ 1 U.S. Government Plaintiff

☒ 3 Federal Question
      (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☐ 4 Diversity
      (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES   (PLACE AN 'X' IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN   (PLACE AN 'X' IN ONE BOX ONLY)

☒ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from another district (specify)

☐ 6 Multidistrict Litigation

☐ 7 Appeal to District Judge from Magistrate Judgment

## V. NATURE OF SUIT   (PLACE AN 'X' IN ONE BOX ONLY)

### A CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- B ☐ 152 Recovery of Defaulted Student Loans (Excl Veterans)
- B ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholder's Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

### A TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**PERSONAL INJURY**
- ☐ 362 Personal Injury- Med Malpractice
- ☐ 365 Personal Injury- Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damages
- ☐ 385 Property Damage Product Liability

### A REAL PROPERTY
- ☐ 210 Land Condemnation
- B ☐ 220 Foreclosure
- ☐ 230 Rent, Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### A CIVIL RIGHTS
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

### PRISONER PETITIONS
- B ☐ 510 Motions to Vacate Sentence
**HABEAS CORPUS:**
- B ☐ 530 General
- A ☐ 535 Death Penalty
- B ☐ 540 Mandamus & Other
- B ☐ 550 Civil Rights
- B ☐ 555 Prison Condition

### FORFEITURE/PENALTY
- B ☐ 610 Agriculture
- B ☐ 620 Other Food & Drug
- B ☐ 625 Drug Related Seizure of Property 21 USC 881
- B ☐ 630 Liquor Laws
- B ☐ 640 R.R. & Truck
- B ☐ 650 Airline Regs
- B ☐ 660 Occupational Safety/Health
- B ☐ 690 Other

### A LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt Relations
- ☐ 730 Labor/Mgmt Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- A ☐ 791 Empl. Ret. Inc. Security Act

### A BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### A PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

### B SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- A ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- A ☐ 871 IRS — Third Party 26 USC 7609

### A OTHER STATUTES
- ☐ 400 State Reapportment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- B ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☒ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☐ 890 Other Statutory Actions
A OR B

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

15 U.S.C. §78(j)

LENGTH OF TRIAL
via _15_ days estimated (for both sides to try entire case)

## VII. REQUESTED IN COMPLAINT:
☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $  Unknown

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ YES   ☐ NO

## VIII. RELATED CASE(S) IF ANY
(See instructions):   JUDGE _Moreno_   DOCKET NUMBER _98-2932_

DATE  _Dec. 3, 1998_

SIGNATURE OF ATTORNEY OF RECORD   _Cindy O Komlassy_   _007714_

FOR OFFICE USE ONLY

RECEIPT # _515133_   AMOUNT _$150.00_   APPLYING IFP ___   JUDGE ___   MAG. JUDGE ___   12-03-98

200 ☑        S&R ,L .DNIKDOOG        77₄0 818 212 XA7 75:01 DEW 86/52/11